# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

- - - - - - - - - - - - - -
## NO. 03-01-00705-CR
## NO. 03-01-00706-CR
- - - - - - - - - - - - - -


**Jose Torres, Appellant**

**v.**

**The State of Texas, Appellee**


**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
NOS. 3012107 & 3012108, HONORABLE BOB PERKINS, JUDGE PRESIDING**

After a bench trial, the district court found Jose Torres guilty of failure to stop and render aid and intoxication assault.[1]  *See* Tex. Transp. Code Ann. ' 550.023(3) (West 1999) (render aid); Tex. Pen. Code Ann. ' 49.07(a)(1) (West Supp. 2002) (intoxication assault).  The court assessed punishment of concurrent sentences of five years and nine years in prison for the respective offenses.  Appellant contends that the district court showed bias by questioning the State=s witnesses and testifying on the State=s behalf, thereby violating appellant=s state and federal constitutional rights to due course of law and due process.  *See* U.S. Const. amend. V; Tex. Const. art. 1, ' 19.  We will affirm the judgment.

## BACKGROUND

These convictions arise from a collision at the intersection of East Seventh and Robert T. Martinez, Jr. streets between appellant=s car and a motorcycle ridden by William Keith Marks.

Several witnesses heard the crash and saw the immediate aftermath.  Austin Police Department (AAPD@) officer Kathy Hector was westbound in her patrol car on Seventh Street at its intersection with Webberville Road, just east of the Martinez intersection.  She saw a car in a parking lot on the north side of Martinez sitting at the curb line, ready to drive out.  She looked away, heard a crash, then looked back and saw a motorcycle falling and the car speeding away.  She pursued and stopped the car, which appellant was driving.  She found beer containers in various stages of emptiness and coldness in the

---

[1] Appellant filed separate notices of appeal from the convictions, creating two appellate causes. Number 03-01-00705-CR concerns the failure to stop and render aid, and number 03-01-00706-CR concerns the intoxication assault.  Because he raises the same arguments in both cases, we will consider them together.

car. Passengers in appellant=s vehicle told her they warned appellant about the oncoming motorcycle and asked him to stop after the collision. Louis Herrera, sitting at a nearby bus stop, and Clayton Shorkey, driving nearby, both saw the events Hector described. Herrera also testified that the motorcycle was eastbound on Seventh and had the right of way.

APD officer Robert Smith of the DWI unit noted a faint odor of alcohol from appellant, who denied he had been drinking. Smith videotaped the field sobriety tests he administered to appellant, who showed signs of intoxication on the horizontal gaze nystagmus test, the walk and turn test, and the one-leg stand.

APD officer Michael Castillo informed appellant, who spoke primarily Spanish, of his rights regarding giving a blood sample. Castillo played a tape in Smith=s patrol car explaining in Spanish appellant=s rights. Before appellant signed the waiver of rights form, Castillo translated the English form for him. Castillo testified that appellant consented orally and in writing to give the blood sample.

APD traffic investigation detective Clarence Jamail testified that appellant=s car was damaged in several places. The right front quarter-panel had marks matching the motorcycle=s paint. The windshield had large circular breaks with hairs in the center that matched Marks=s hair. The car had dents and marks consistent with a person rolling over it. Jamail found damage to the motorcycle consistent with the damage to the car, and a gouge in the street that matched the damage to the bottom of the motorcycle. He testified that a motorcycle on Seventh Street has the right-of-way over a car entering the street from a parking lot. Jamail estimated that appellant=s car was traveling around fifteen miles per hour at the time of

the collision. He also estimated from the direction motorcyclist Marks flew after the collision that the motorcycle was traveling at about the same speed as the car.

Glenn Carl Harbison, a chemist for APD, testified that appellant=s blood sample showed a .12 blood-alcohol concentration.

Marks testified that he had been driving westbound into town, despite statements by the Court and the defense attorney that other testimony indicated that he had been eastbound. Marks testified that he did not remember the collision because he suffered a head injury and was unconscious for two weeks after the accident. He denied drinking or consuming illegal drugs that day, but said that he was taking medications for diabetes, hyperthyroidism, and depression.

## DISCUSSION

By four points of error, appellant contends that the district court violated his federal and state constitutional rights to due process and due course of law by taking actions that showed bias toward the State. By his first two points, appellant complains about the court=s examining the State=s witnesses; by his remaining points, he contends that the court testified on behalf of the State.

Due process requires a neutral and detached hearing body or officer. *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973). The Texas Constitution requires no less. *Earley v. State*, 855 S.W.2d 260, 262 (Tex. App.CCorpus Christi 1993), *pet. dism=d, improvidently granted*, 872 S.W.2d 758 (Tex. Crim. App. 1994). We presume the trial court was neutral and detached absent a clear showing to the contrary. *See id.*; *Fielding v. State*, 719 S.W.2d 361, 366 (Tex. App.CDallas 1986, pet. ref=d). Trial courts have the right to manage the trial, including the order of proof. *Silva v. State*, 635 S.W.2d 775, 778 (Tex. App.CCorpus Christi 1982, pet. ref=d). When courts ask witnesses questions during jury trials, they must avoid conveying their opinion on the facts to the jury and becoming an advocate for a particular position. *Moreno v. State*, 900 S.W.2d 357, 359 (Tex. App.CTexarkana 1995, no pet.). Courts in bench trials have more latitude in questioning witnesses because there is no risk of improperly influencing the jury. *See id*; *Marshall v. State*, 297 S.W.2d 135, 136-37 (Tex. Crim. App. 1956); *Davis v. State*, 158 S.W. 283, 284 (Tex. Crim. App. 1913). In bench trials, courts may go beyond asking for mere clarification and ask questions that an advocate might ask in order to assist their fact-finding process. *Moreno*, 900 S.W.2d at 359. A court must avoid becoming involved as an advocate to the extent that it cannot make an objective finding of fact in the case. *Id*. at 360.

***The court=s questioning of witnesses***

Appellant complains about several questions by the court concerning various aspects of the testimony. Appellant contends that the court intervened consistently and pervasively on behalf of the State in such a manner that the court assumed the burden of proving the State=s case. Appellant argues that, regardless of whether the State could have made its case without the court=s help, the court improperly relinquished its neutrality and showed a clear bias in favor of the State. We do not agree with appellant=s characterization of the court=s actions.

The first instance in question involves the prosecutor=s inquiry about which direction a driver would turn to go from Seventh Street onto Martinez.[2] The question was ambiguous because it did not specify which direction the hypothetical driver was traveling on Seventh Street. The court=s interjection clarified the question. The witness then spontaneously offered the answer for the converse direction.

---

[2] MS. MEDINA: [the Prosecutor] Mr. Herrera, at the intersection of 7th and Robert T. Martinez, someone driving down that street, are they required to stop if they=re making a right onto Robert T. Martinez?

A. Okay.

THE COURT: If they=re going east?

A. If you=re going east and you turn on Robert Martinez, you=re making a right.

Q. (by Ms. Medina) Okay.

A. Okay. If you=re coming down 7th Street heading west and you want to turn on Robert Martinez, you=ll be making a left.

**6**

The court asked many questions of Officer Smith about the circumstances under which appellant, a non-English speaker, signed the consent form written in English giving consent for a blood-alcohol concentration test.[3] Smith's responses led the court to sustain appellant's objection to the consent form; that ruling plainly did not favor the State. Nor did the court show bias by stating that Castillo, the officer fluent in Spanish who did the translating, would be a better source of what Castillo said in Spanish when translating the consent form than Smith, who admitted limited understanding of Spanish. The court did not finally rule on admitting the consent form until after Castillo testified regarding what he said to appellant, justifying the court's speculation about the content of his testimony.

---

[3] This series of questions spans four pages in the reporter's record and occurred after appellant objected to the admission of the blood-alcohol concentration test results on the basis that he did not knowingly consent to the test. The court asked Officer Smith how the admonition of rights was communicated to appellant. When Smith's responses indicated that Officer Castillo explained the warnings to appellant in Spanish, the court asked the prosecutor, "Is he going to be here?" The prosecutor responded, "He can be. He's not here now . . . . Or he's not here yet." When Smith said he could tell that Castillo was translating the warning into Spanish, but could not state verbatim what Castillo said, the court said, "I think it probably would be better for us to have Castillo come in and testify as a first-hand witness since he knows for sure what he said and—or what he explained to him and everything. So, I guess, I'll sustain the objection at this point.

The court asked about the meaning of gouges in the pavement,[4] the presumptions of

momentum analysis,[5] and the effect of the passage of time on the relevance of blood-alcohol test results to

---

[4] After Detective Jamail correlated gouges apparent from a photograph and diagram of the accident scene, the following exchange occurred:

THE COURT: So is the C your theory is, then, that the motorcycle is being pushed along in front of the car?

THE WITNESS: No. Actually C

THE COURT: Or underneath? Or what C how is it that it=s made?

THE WITNESS: Actually, it would have been knocked down on its side after the initial impact and just slide on the roadway.

THE COURT: Just carried along.

THE WITNESS: It was not pinned under the car.

THE COURT: Okay.

[5] THE COURT: When you say Astopped,@ that the motorcycle would have had to have stopped, you=re meaning stopped without being dragged in order to do the momentum analysis.

THE WITNESS: [JAMAIL] Yes. The momentum analysis is based on both vehicles sliding to a stop across the roadway.

THE COURT: Right. Of their own volition or whatever.

THE WITNESS: Yes.

THE COURT: Not being forced down the street or something like that.

THE WITNESS: That=s correct.

8

the intoxication level at the time of arrest.[6] Such questions are within the court=s right to seek clarification of

---

THE COURT:     Okay.  Go ahead.

[6] After Harbison testified about the results of the blood-alcohol test and the effect of the passage of time between arrest and test on the accuracy of the test, the following exchange occurred:

THE COURT:     Okay.  In terms of the discharge rate, or whatever you call it when the alcohol is actually exiting the body, that=s .1 per hour, two per hour?=

THE WITNESS:   It=s approximately .02 per hour.

THE COURT:     And so but the thing is you don=t . . . with the blood specimen being taken an hour or hour 15 or hour 40 after the event, and

testimony in its role as fact finder.  We do not believe they show the court was biased in favor of the State.

Indeed, it is not clear that the momentum analysis questions favored either side, and the chemist=s admission

that he did not know certain facts important to extrapolating blood-test results could favor appellant.

---

with the exiting of the alcohol, the thing is you don=t really know exactly how much there is because you don=t know what was in his stomach or anything else.

THE WITNESS: That=s correct.

THE COURT: You don=t know how fastC

THE WITNESS: It all depends what time the alcohol was put into the body and how much alcohol is actually absorbed from the stomach into the system at the time of the collision.  And I don=t know that.

The court also asked questions trying to reconcile Marks's recollection that he was riding westbound with other witnesses' testimony that he was riding eastbound.[7] Though this series of questions

---

[7]  THE COURT:  Is it possible that you'd already gone down to Sixth Street and already been with your friends that evening and then you were heading home at 1:00 o'clock?

THE WITNESS:  [the victim] No, sir.

THE COURT:  It's not possible.

THE WITNESS:  Not possible.

THE COURT:  Obviously when you had the wreck it was a very traumatic thing and blotted out your memory of the wreck itself and everything after that for two weeks. Is that right?

THE WITNESS:  That's what appears to me to have happened.

THE COURT:  But you feel pretty confident about the fact that you were eastbound, that you were westbound on Seventh.

THE WITNESS:  I was headed into town and that's, like I said, that's what I remember and then all of a sudden I was in Brackenridge Hospital.

THE COURT:  Is it possible that you made a U-turn to go back and get something or something like that on Seventh Street?

THE WITNESS:  I don't think so, sir.

THE COURT:  I believe that the officer, there was an officer that was close by at the time of the wreck. Did she actually see it or she heard it first and then looked and saw?

MS. MEDINA:  [the prosecutor] She heard it and then she looked and then she saw the collision.

**11**

THE COURT:     And there wereC

MS. MEDINA:    Two civilian witnesses.

THE COURT:     Weren=t there a couple in the car?

MS. MEDINA:    There were witnesses, at least two passengers in the defendant=s vehicle, yes, sir.

THE COURT:     Did they also testify that the vehicle was eastbound[?]

MS. MEDINA:    Yes. They testified they saw the vehicle or they saw the motorcycle coming and told the defendant about it.

THE COURT:     They weren=t asked whether it was eastbound or westbound?

MR. MARTINEZ:  [appellant=s counsel] No, Your Honor, I don=t remember. I recall there were excited utterances and they said they saw him coming and yelled it was coming and the accident happened. That=s what I recall. So it happened pretty quick apparently from what the excited utterances is all about.

THE COURT:     Okay. But the impact is to the left front of the motorcycle.

MR. MARTINEZ:  No, sir. It=s on the right front of the automobile in front of the motorcycle.

THE COURT:     Hit the right front of the automobile which was definitely going south.

MR. MARTINEZ:  Right.

THE COURT:     The only way it has to be that he was eastbound.

MR. MARTINEZ:  Yes, sir.

THE COURT:     And the motorcycle, the point of impact on it is it on the left side of the motorcycle?

**12**

involves speculation about why Marks=s recollection does not square with the physical and testimonial evidence, the inquiry is an attempt to clarify the evidence. It did nothing to dissuade Marks from his belief. It does not show bias.

We find no error in the cited instances in which the court questioned witnesses.

### *The court=s testimony*

Though the district court never took the stand to testify, appellant argues that several comments from the bench constituted testimony and showed bias toward the State. Appellant acknowledges that courts can take judicial notice of facts that are generally known within the court=s jurisdiction or can be accurately and readily determined by resort to sources whose accuracy cannot reasonably be questioned. *See* Tex. R. Evid. 201. He notes, however, that the court never announced that

---

MR. MARTINEZ: I think it=s head-on.

THE WITNESS: Left side. First thing that got hit was my leg.

THE COURT: The left side.

THE WITNESS: And then the way the frame and everything is bent, everything is kind of pushed to the right.

THE COURT: Yeah. So it looks like it was. So really under that analysis you had to have been eastbound, because we know where the car came out of. We know that it was southbound. And so to hit the right side of the car you had to be going east. I understand with the mental trauma that you had, you know, clearly wouldn=t be surprised if that blotted out your memory of what happened that day or whatever.

**13**

it was taking judicial notice of any fact. He argues that all of the cited instances involve the court=s personal

knowledge rather than generally known facts, and thus that taking judicial notice of such facts was not

proper. *See id.*; *see also Wilson v. State*, 677 S.W.2d 518, 524 (Tex. Crim. App. 1984).

The court stated personal knowledge of the layout of the relevant intersection and who had

the right of way there,[8] and also the layout of nearby streets.[9] At most, the court seems to try to avoid

---

[8] Q. [by Ms. Medina, the prosecutor]: At the intersection of Robert T. Martinez and 7th Street, are there stop signs at that intersection?

A. [by Mr. Herrera]: Yes. NotCnot heading west or east on 7th Street but Robert Martinez when you come to 7th Street, you got a stop sign.

Q. Okay. Now, the motorcycle you said was going down 7th Street.

A. Right.

Q. Was the motorcycle required to stop in any way?

A. No.

Q. Okay. There=s nothing there that requiresC

THE COURT: I=m familiar with that intersection. . . . I know who=s got the right-of-way there. 7th Street has got the right-of-way all the way through except for the light at Webberville Road.

THE WITNESS: Right.

THE COURT: And also at Robert Martinez, there is also a littleCyou got to stop there.

**14**

THE WITNESS: Yeah.

MS. MEDINA: Okay.

THE WITNESS: Yeah, there=s a traffic light right there on RobertC Webberville and 7th.

A. [by Officer Smith]: And the victim was laying here in the ditch in the gutter right there at the intersection of Hidalgo and Robert T. Martinez.

Q. [by Ms. Medina]: Okay. So I=ve seen you=ve made an AM@ marked here for the motorcycle at the intersection of 7th and Robert Martinez and then a AV@ for the victim at the intersections of Robert T. Martinez and C what street is this did you say?

THE COURT: Hidalgo.

THE WITNESS: Hidalgo.

THE COURT: And he was on the east curb line.

THE WITNESS: He was on the east curb line C north C north curb line of Hidalgo.

THE COURT: Northbound, uh-huh.

Q. [by Ms. Medina]: Okay. And then you said you saw the Defendant=s vehicle stop down here with Officer Hector.

R. Right.

Q. And you said that is about four blocks from the intersection of 7th and Robert T. Martinez.

THE COURT: It=s three.

A. Well, because of the angle C yeah, because of the angle, it=s about distance-wise, four blocks but it=s three. From 7th to 4th, that=s three city blocks.

15

further examination on a subject about which there was no dispute. Before the court spoke, Herrera testified that the motorcycle was not required to stop in any way. After the court effectively took judicial notice of the functioning of the intersection, Herrera nevertheless confirmed the court=s assertions about the nature of the intersection and right of way, as did Detective Jamail later without any comment or intervention by the court. When the court corrected the prosecutor=s characterization of Hidalgo Street, Smith qualified his agreement with the court=s assertion. To the extent the court=s correction is relevant to the elements of the offenses, it favors appellant because it diminishes the distance that appellant fled. These statement do not show bias for the State.

Appellant alleges that the court vouched for Castillo=s memory and credibility before he testified.[10] We disagree with appellant=s characterization of the court=s statements. The court made the remark in the process of sustaining appellant=s objection to the introduction of the consent form through Smith, who was not fluent in Spanish but stated he could Afollow a conversation@ in Spanish. Rather than listening to Smith speculate on what he heard, the court suggested hearing from the Spanish-fluent Castillo what he remembered saying. The court did not imply that he as fact finder would accept Castillo=s recollection of his translation of the consent form to appellant. The record does not show bias. Further,

---

[10] THE COURT: I think it probably would be better for us to have Castillo come in and testify as a first-hand witness since he knows for sure what he said andCor what he explained to him and everything. So, I guess I=ll sustain the objection at this point.

appellant had the opportunity to attack Castillo=s credibility when Castillo testified, and the court did not admit the exhibit until Castillo testified.

Appellant also complains that the court testified by correcting the prosecutor=s reference to the number of an exhibit.[11] Such a comment is not testimony. The exhibit had been marked, offered, and admitted through a previous witness. The prosecutor was asking the witness to describe the contents of the exhibit; it is not clear if she was holding the exhibit or pointing to it. The court merely clarified for the record the number of the indicated exhibit. There is no indication that the court directed the prosecutor to inquire about a different exhibit or that the prosecutor changed the indicated exhibit on the court=s suggestion. Ensuring that the record accurately reflects the events in the trial does not show bias.

Appellant also complains about the court=s assertion during the State=s examination of Marks that Marks=s testimony that he was riding westbound conflicted with the testimony of earlier witnesses.[12] The court=s statement is not testimony, but is an accurate recounting of testimony given in the

---

[11] Q. [Ms. Medina]: Okay. And what is represented by No. 5 here?

THE COURT: Six.

Q. Ms. Medina)]: I=m sorry, six.

[12] THE COURT: My recollection of the testimony was the motorcycle was eastbound.

MR. MARTINEZ: Mine, too.

THE COURT: That would be the opposite direction.

MS. MEDINA: Okay.

**17**

first part of the trial two weeks earlierCa recounting echoed by appellant=s trial counsel. Marks nevertheless was steadfast in his belief that he had been westbound on Seventh Street.  We discern no bias toward the State.  The conflict existed regardless of whether the court pointed it out, and the physical evidence strongly refutes Marks=s version.

Further, the conflict in the testimony regarding Marks=s direction of travel does not affect the proof of the elements of intoxication assault or failure to stop and render aid.  The undisputed evidence shows that Marks was on Seventh Street with the right of way over appellant, who drove his car out of a parking lot on the north side of Seventh Street.  The direction Marks was proceeding on Seventh Street does not bear on whether Marks helped cause the accident or on whether appellant was intoxicated, collided with Marks after failing to yield the right of way, and failed to stop and render aid.

---

Q. Do you remember at 1:13 if you were going eastbound or westbound on Seventh Street, sir?

A. [by Marks, the victim]:  I thought I was westbound.

Appellant also alleges that the court testified on this same issue in the passages set out in footnote seven above.

The court=s speculation that Marks could have been exposed to marihuana at band practice[13] was a speculative inference by the court, attempting to reconcile the presence of cannaboids in Marks=s blood with Marks=s testimony that he had not used illegal drugs.  We see no bias in the court=s speculation.  Further, how the cannaboids got into his system is irrelevant to the elements of the offenses.  Whether Marks was impaired may help determine if he, rather than appellant, caused the accident, but how he may have ingested marihuana is irrelevant to that inquiry.

*Cumulative effect of the court questioning witnesses and Atestifying@*

Appellant argues that, even if none of the cited instances is sufficient alone to show bias violating his constitutional rights, they do when cumulated.  We disagree.

---

[13] THE COURT:   And, you know, the thing about it is, insofar as the marijuana, I mean, my understanding is if you do inhale that, you know, that there=s going to be, you know, something show up.  And so, you know, he testified about how he had gone with this rock and roll band friends that night before, the night of the accident.  Wouldn=t be surprised to me if somebody was smoking over there.

If the court shows any bias, it is a desire for efficient and clear presentation of the issues. This appears to be the impetus for interjecting his knowledge of intersections, asking questions of witnesses, correcting misstatements, and pointing out inconsistencies in testimony. The court=s comments gave the parties equal insight into its evolving thought processes. Nothing in the record indicates that any of the cited instances changed the State=s strategy, prompted the State to call witnesses it would not have called but for the court=s statements, adduced evidence relevant to the offenses that was not otherwise adduced, or otherwise favored the State.

Even if one or all of the cited instances showed bias, however, the comments do not require reversal. The evidence shows beyond a reasonable doubt that appellant was intoxicated, that he was stopped in his vehicle at a parking lot exit and required to yield the right of way to traffic on Seventh Street, that Marks was riding his motorcycle on Seventh Street, that appellant=s passengers warned him of the oncoming motorcycle but that appellant nevertheless drove his vehicle onto Seventh Street in front of Marks, that Marks crashed into the side of appellant=s car and was seriously injured, that appellant was told and had to know that he and Marks had collided, and that appellant drove away without stopping and rendering aid. The only conflict in the evidence was between Marks=s recollection and the rest of the evidence about which way he was traveling at the time of the collision; the court was entitled to disregard Marks=s testimony, particularly because of the head injury the helmetless Marks suffered in the accident. The court=s speculation about Marks=s head injury in open court at most alerted appellant=s counsel that the court was considering disregarding Marks=s recollection of his direction of travel on that basis. We

**20**

conclude beyond a reasonable doubt that the alleged errors did not, either individually or collectively, contribute to appellant=s conviction and punishment. *See* Tex. R. App. P. 44.2(a).

## CONCLUSION

Because the record contains no support for appellant=s charges of bias, we affirm the judgment and sentence.

Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel

Affirmed

Filed:   August 30, 2002

Do Not Publish